# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 24, 2018

Lyle W. Cayce
Clerk

————

No. 16-11244

————

ERIC C. DARDEN, as Administrator of the Estate of Jermaine Darden and on behalf of the statutory beneficiaries of the Estate of Jermaine Darden (which are Donneika Goodacre-Darden, surviving mother of Jermaine Darden, Charles H. Darden, surviving father of Jermaine Darden),

> Plaintiff–Appellant,

v.

CITY OF FORT WORTH, TEXAS; W. F. SNOW; J. ROMERO,

> Defendants–Appellees.

————

Appeal from the United States District Court
for the Northern District of Texas

————

ON PETITION FOR REHEARING

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Treating Defendants–Appellees' petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is DENIED. The petition for rehearing en banc is also DENIED. The prior opinion, *Darden v. City of Fort Worth, Tex.*, 866 F.3d 698 (5th Cir. 2017), is withdrawn, and the following opinion is substituted:

Fort Worth Police Officers W.F. Snow and Javier Romero arrested Jermaine Darden, a black man who was obese, while executing a no-knock

No. 16-11244

warrant at a private residence. In arresting Darden, the officers allegedly threw him to the ground, tased him twice, choked him, punched and kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him. Darden suffered a heart attack and died during the arrest. The administrator of Darden's estate subsequently brought this 42 U.S.C. § 1983 case against Officers Snow and Romero and the City of Fort Worth (the "City"). The district court granted summary judgment in favor of the officers and the City and dismissed all claims. We REVERSE in part, VACATE in part, and REMAND.

## I. BACKGROUND

In 2013, the Fort Worth Police Department investigated claims that cocaine was being sold from a private residence. A magistrate judge issued a warrant that allowed the officers to enter the residence without first knocking and announcing themselves. On May 16, 2013, a large team of heavily armed police officers executed the warrant. Officer Snow was assigned to the entry team, which was tasked with breaking down the front door, entering the residence, and securing the premises. Officer Romero drove the van that transported the team to the residence. He was also assigned to stand guard near the front door while other officers entered the residence and arrested the people inside. Two other members of the team wore cameras on their helmets, which captured on video some but not all of the events that transpired as the warrant was executed.

When the police first arrived at the house, the entry team broke down the front door with a battering ram, yelled that they were police, and ordered everyone to get down. A large man, later identified as Darden, was kneeling on the seat of a couch near the door when the officers first entered, and he immediately raised his hands in the air. Darden weighed approximately 340 pounds. Several other people were sitting and standing in a nearby dining

room. As Officer Snow entered the residence, he reached out and ripped the shirt off Darden's back, apparently in an attempt to get Darden from the couch to the ground. The videos do not show what happened during the twenty-five seconds that followed, and there is conflicting testimony about what transpired.[1] According to witnesses for the plaintiff, Darden "had no time to react" before "[h]e was thrown on the ground" by the officers. Witnesses also testified that Darden never made any threatening gestures and did not resist arrest.

After approximately twenty-five seconds, it became apparent that some sort of incident was occurring in the front room. One of the videos shows Darden lying on the ground face up. An officer in the front room yelled, "Roll over on your face," at which point, Darden appeared to follow directions and rolled over onto his stomach. The video then pans away from the scene and does not turn back for approximately fifteen seconds. The second video shows that Officer Romero then ran into the house to assist. However, in that video, much of the interaction between Darden and the officers is totally obscured by the couch. Although not captured by the video, eyewitnesses testified that Officer Romero proceeded to choke Darden and to repeatedly punch and kick Darden in the face.[2]

At one point, Darden's body appeared to come up off the ground for a moment, but it is not clear from the video footage whether he came up of his own volition or was pulled up by police. The officers then backed away, and Officer Snow used a Taser on Darden. Shortly thereafter, Darden rolled over onto his stomach and appeared to push himself up on his hands. He was

---

[1] In one video, the officer wearing the camera went into one of the bedrooms at the rear of the residence. In the second video, the officer wearing the second camera went into the dining room and ordered people to get on the ground.

[2] In fact, Officer Romero himself testified that he punched Darden in the face and explained that he had been trained to do so when arrestees were resisting arrest.

No. 16-11244

immediately pushed back down into the ground by police. Throughout these events, other people in the house repeatedly yelled, "He's got asthma," and "He can't breathe." Eyewitnesses also testified that Darden himself told the officers he could not breathe.[3]

A few seconds later, the videos briefly show Darden on his knees, with his hands in the air, before Officer Snow tased him a second time.[4] Darden fell to the ground and rolled onto his back, where he lay face up for a few seconds. Officer Romero then pushed Darden over onto his stomach and pressed his face into the ground. As Officer Romero tried to pull Darden's left arm behind his back, Darden seemed to pull his arm away. The officers then pushed Darden back into the ground, and one officer appeared to put him in a choke hold.

At that point, other people in the residence were still yelling that Darden could not breathe. Nevertheless, several officers continued to push Darden's body into the ground face down, pressed his face and neck into the floor, and pulled his arms behind his back so that Officer Romero could handcuff him. As Officer Romero finished securing the handcuffs, Darden's body went limp. The officers then pulled Darden's debilitated body up into a sitting position and left him there. Darden appeared to be unconscious, and his head hung down on his chest. It was subsequently determined that Darden had suffered a heart attack and died.

The administrator of Darden's estate brought suit under 42 U.S.C. § 1983, claiming that Officers Snow and Romero used excessive force in arresting Darden and that the City was liable for failing to adequately train the officers. All of the defendants filed motions for summary judgment, and the

---

[3] Eyewitnesses testified that Darden pushed himself up on his hands because he was trying to get into a position where he could breathe.

[4] Officer Snow claims that he had no further contact with Darden after discharging the Taser the second time.

4

district court granted their motions and dismissed the case. The district court determined that the officers had not violated clearly established law and were thus entitled to qualified immunity. In addition, the district court stated that the plaintiff had failed to show that Darden's death resulted only from the officers' use of force. Because it held that the officers had not violated Darden's constitutional rights, the district court likewise dismissed the municipal liability claims. This appeal followed.

## II. DISCUSSION

"We review a summary judgment *de novo,* 'using the same standard as that employed by the district court under Rule 56.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A.     Officers Snow and Romero

The Supreme Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We must determine (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* "A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful. *See Manis v. Lawson*, 585 F.3d 839, 846 (5th Cir. 2009). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed

first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. However, deciding the two prongs in order "is often beneficial." *Id.*

Once an official pleads qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Still, at the summary judgment stage, we must "view the facts in the light most favorable to . . . the nonmoving party." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1769 (2015). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"To prevail on an excessive-force claim, [a plaintiff] must show '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012)). "Our precedents recognize that inquiries regarding whether a use of force was 'clearly excessive' or 'clearly unreasonable . . . are often intertwined,' and we consider those questions together below." *Hanks*, 853 F.3d at 744 (omission in original) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

### 1. *Injury and Causation*

The district court held that the "plaintiff could not establish an excessive force claim because he cannot show that Darden's death 'resulted directly and only from the use of force that was clearly excessive to the need.'" *See Knight v. Caldwell*, 970 F.2d 1430, 1432 n.3 (5th Cir. 1992). According to the plaintiff's medical expert, "Darden died as a result of the application of restraint

(physical struggle, 4 taser dart strikes,[5] prone position with the weight of police officers on top of Mr. Darden) and consequential hypoxia[6] and increased cardiac demand." But the medical expert went on to explain that "[t]he application of restraint [was] a contributing causal factor along with natural disease." The other contributing factors were focal coronary artery disease, "which can increase the likelihood of developing an arrhythmia during a struggle," and chronic lung disease, which "can impede air exchange causing hypoxia (low oxygen) and increase the risk of cardiac arrhythmia during exertion such as a struggle." Thus, the district court's conclusion that the injury did not result directly and only from the use of force was essentially based on the fact that Darden had preexisting medical conditions that increased his risk of death during the incident.

The district court erred in reaching this conclusion. According to the eggshell skull rule, "a tortfeasor takes his victim as he finds him." *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995), *rev'd on other grounds* 79 F.3d 401 (5th Cir. 1996) (en banc); *see also Koch v. United States*, 857 F.3d 267, 274 (5th Cir. 2017). The eggshell skull rule is applicable in § 1983 excessive force cases. *See Dunn*, 54 F.3d at 251. Darden's preexisting medical conditions increased his risk of death during a struggle, and in that way, they contributed to his death. However, the evidence suggests that Darden would not have suffered a heart attack and died if the officers had not tased him, forced him onto his stomach, and applied pressure to his back. Indeed, the medical expert ultimately concluded that "Darden's manner of death should not have been ruled as

---

[5] When a Taser's trigger is pulled, a set of two dart-like probes is discharged. Thus, although Darden was tased only twice, four probes made contact with his body.

[6] "Hypoxia means a shortage of oxygen in the blood," and it can "be induced by compressing the lungs, which the weight of several persons on one's back can do." *Richman v. Sheahan*, 512 F.3d 876, 880 (7th Cir. 2008).

Natural." Accordingly, the plaintiff can show that the use of force was the direct and only cause of Darden's death.

### 2. *Clearly Excessive and Clearly Unreasonable Use of Force*

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In making this determination, a court should consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

#### a. *Severity of the crime*

The magistrate judge who issued the warrant determined that there was probable cause to believe that suspects at the residence were dealing drugs. These types of drug crimes are certainly serious offenses. *See Orr v. Copeland*, 844 F.3d 484, 493 (5th Cir. 2016) (noting that an officer "had reason to suspect that [a driver] was involved in serious drug crimes" when the driver "had a white residue on his face at the time of the traffic stop" and the officer "observed drug paraphernalia—plastic baggies—hidden in the backseat of [the driver's] car"). Thus, the severity of the crime at issue weighs in favor of the officers.

### b. *Immediate safety threat*

There is a genuine factual dispute over whether Darden posed an immediate safety threat to the officers. There were certainly inherent dangers associated with executing a narcotics warrant, and the officers were aware that lookouts were positioned in the house across the street. Still, Darden "was not suspected of committing a violent offense," *Cooper*, 844 F.3d at 522, and testimony suggests that Darden did not threaten the officers in any way when they entered the residence. Eyewitnesses testified that Darden put his hands in the air, and indeed, the video shows Darden raising his hands when the officers enter the home. Witnesses also testified that Darden made no threatening gestures and did not resist arrest. Therefore, a jury could conclude that no reasonable officer would have perceived Darden as posing an immediate threat to the officers' safety. *See Hanks*, 853 F.3d at 743, 746; *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013); *Deville*, 567 F.3d at 167.

### c. *Resisting arrest*

The district court's analysis largely turned on an assessment that Darden was actively resisting arrest when Officers Snow and Romero used force on him. "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville*, 567 F.3d at 167. "However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). According to the district court, "[t]he video makes clear that Darden did not get on the ground as ordered by the officers and that the taser was employed to assist them in getting Darden to the ground."

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe

it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, in *Scott*, the Supreme Court held that because the nonmovant's version of events was "so utterly discredited" by a videotape "that no reasonable jury could have believed him," the court of appeals "should have viewed the facts in the light depicted by the videotape." *Id.* at 380–81. Yet the standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account. *See Ramirez*, 716 F.3d at 374.

In the instant case, the videos do not meet that difficult standard because they do not show whether Darden got onto the ground when he was commanded to do so. After the officers entered the house and ripped off Darden's shirt, the next shot of Darden shows him lying on the ground approximately twenty-five seconds later. Neither video shows what transpired between those two events. Nor do the videos make clear how Darden transitioned from kneeling on the couch to lying on the floor. The parties offer conflicting accounts of Darden's actions during those twenty-five seconds: witnesses for the plaintiff claim that Darden was compliant with the officers' commands and was thrown to the ground by police, whereas Officer Snow claims that Darden was attempting to stand up and was resisting the officers' attempts to get him on the ground. In contrast to *Scott*, however, the videos do not favor one account over the other and do not provide the clarity necessary to resolve the factual dispute presented by the parties' conflicting accounts.

Based on the evidence in the record, a jury could conclude that no reasonable officer on the scene would have thought that Darden was resisting arrest. The videos show that Darden raised his hands when the officers entered the residence, and it appears that he rolled over onto his face at one point after

the officers instructed him to do so. Moreover, eyewitnesses testified that Darden was thrown to the ground before he could react, that he complied with the officers' commands, and that he did not resist arrest. From the video recordings, it appears that Darden later pushed himself up on his hands, and eventually onto his knees, and he seemed to pull his arm away from the officers when they were trying to handcuff him. But those events occurred while other people in the house were loudly and repeatedly yelling that Darden had asthma and was trying to breathe. In addition, Darden allegedly told the officers he could not breathe.

Snow argues that the officers "had no way of knowing in that tense, uncertain, and rapidly evolving situation" if it was "true or false" that Darden was struggling to breathe. He contends that "a police officer need not credit everything a suspect tells him." *See Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002). However, the issue of whether reasonable officers in this situation would have credited the warnings from Darden and the other suspects is a factual question that must be decided by a jury. As the Supreme Court has made clear, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Liberty Lobby*, 477 U.S. at 249. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A jury could conclude that all reasonable officers on the scene would have believed that Darden was merely trying to get into a position where he could breathe and was not resisting arrest.[7]

---

[7] Officer Snow also contends that the "testimony of Plaintiff's own witnesses fully undermines his claim." First, he argues that one of the eyewitnesses, Donna Randle, "acknowledge[d] that it would have appeared to officers that Jermaine Darden was resisting them." Randle was asked by defense counsel, "On the date of the incident in question, is it your position that the police thought Jermaine was fighting them, but really he was trying to get into a better position, so he could breathe easier?" Randle responded, "Yes." This was

No. 16-11244

### *d. Officer Snow's use of force*

At this juncture, we must analyze the officers' actions separately. In cases where the defendants have not acted in unison, "qualified immunity claims should be addressed separately for each individual defendant." *Kitchen v. Dall. Cty.*, 759 F.3d 468, 480 (5th Cir. 2014) (quoting *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005)), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007).

First, we consider whether a jury could conclude that Officer Snow used excessive force when he allegedly threw Darden to the ground and tased him. We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest. *See Ramirez*, 716 F.3d at 377–78; *Newman*, 703 F.3d at 762–63; *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). Thus, if a jury finds that Darden was not actively resisting arrest, then a jury could likewise conclude that Officer Snow used excessive force by throwing Darden to the ground and tasing him twice. The facts the plaintiff has alleged therefore make out a violation of a constitutional right.

Furthermore, the right at issue was clearly established at the time of Officer Snow's alleged misconduct. Our case law makes clear that when an

---

both a leading and compound question, so it is difficult to determine what Randle meant. Even if Officer Snow has accurately characterized Randle's testimony, however, Officer Snow has cited no authority to support his contention that a witness's speculation about what officers would have perceived can be used to fully discredit the plaintiff's version of events at the summary judgment stage.

Officer Snow also asserts that "Clifton Crippen testified that Darden was struggling against the officers trying to get on his side." But throughout his testimony, Crippen made clear that Darden was simply trying to breathe and that others in the residence had repeatedly informed the officers that Darden was trying to breathe. Accordingly, the testimony of the plaintiff's witnesses does not necessarily undermine the plaintiff's version of events.

arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *See Cooper*, 844 F.3d at 524; *Newman*, 703 F.3d at 763; *Bush*, 513 F.3d at 502; *see also Graham*, 490 U.S. at 396 (including whether an arrestee "is actively resisting arrest" among factors to consider in determining whether a particular use of force is unreasonable). For instance, we held in *Bush* that it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee "was not resisting arrest or attempting to flee." 513 F.3d at 502. Similarly, in *Newman* we found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's "behavior did not rise to the level of 'active resistance.'" 703 F.3d at 763.

In the present case, eyewitnesses claim that Darden put his hands in the air when the officers entered the residence, complied with the officers' commands, and did not resist arrest. Yet Officer Snow allegedly threw Darden to the ground and twice shocked him with a Taser while he was being beaten by Officer Romero. In light of our prior case law, Officer Snow should have known that he could not use that amount of force on an individual who was not resisting arrest.

It is worth pointing out that a jury may ultimately conclude that Darden did not comply with the officers' commands and was actively resisting arrest. Under those facts, Officer Snow's decisions to force Darden to the ground and tase him might have been reasonable. *See Carroll v. Ellington*, 800 F.3d 154, 174–75 (5th Cir. 2015) (declining "to reach the close constitutional question" of whether "an officer's application of a Taser to an unarmed, seated suspect who fail[ed] to comply with an order to get on the ground" was excessive force). However, on the record before us, there are genuine disputes of material fact as to whether Darden was actively resisting arrest and whether the force Officer Snow used was clearly excessive and clearly unreasonable. Thus, we

hold that Officer Snow was not entitled to qualified immunity, and the district court erred in granting his motion for summary judgment.

### e. Officer Romero's use of force

Next, we must determine whether a jury could find that Officer Romero used excessive force when he allegedly choked, kicked, and punched Darden and forced Darden into a prone position to handcuff him behind his back. As an initial matter, we note that this was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision. Rather, Officer Romero acknowledges that he stood at his post near the front door for a while and observed the interaction between Darden and Officer Snow before running into the house to assist. In other words, Officer Romero saw whether Darden was resisting and saw how much force had already been used on Darden. He needed to take those perceptions into account in assessing how much additional force, if any, was necessary. *See Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").

As stated, we have found that a police officer uses excessive force when the officer strikes, punches, or violently slams a suspect who is not resisting arrest. *See Newman*, 703 F.3d at 762–63; *Bush*, 513 F.3d at 501–02; *see also Griggs v. Brewer*, 841 F.3d 308, 315–16 (5th Cir. 2016) (suggesting that "punching or otherwise gratuitously harming a restrained suspect constitutes excessive force" but finding no excessive force violation because arrestee actively resisted). Thus, if a jury finds that no reasonable officer on the scene would have perceived Darden to be actively resisting arrest, then a jury could

No. 16-11244

also conclude that Officer Romero used excessive force by choking Darden and repeatedly punching and kicking him in the face.[8]

Darden's right to be free from such force was also clearly established at the time of Officer Romero's alleged misconduct. The law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting. *See Cooper*, 844 F.3d at 524; *Newman*, 703 F.3d at 763; *Bush*, 513 F.3d at 502; *see also Graham*, 490 U.S. at 396. Moreover, at the time of the alleged misconduct it was clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force. *See Newman*, 703 F.3d at 762–63; *Bush*, 513 F.3d at 501–02.

In the case at bar, eyewitnesses testified that Officer Romero choked, punched, and kicked Darden, even though Darden was purportedly complying with the officers' orders and not resisting arrest. Officer Romero also forced Darden—an obese man—onto his stomach, pushed his face into the floor, and pulled Darden's hands behind his back. All the while, other people in the

---

[8] We also find relevant, but not dispositive, the fact that Officer Romero's alleged conduct appears to have violated Fort Worth Police Department policies requiring officers to exercise "[e]xtreme caution" when arresting "a prisoner that is obese . . . since cuffing behind the back and laying the prisoner in a prone position could lead to positional asphyxia" (otherwise known as hypoxia). Fort Worth, Tex., Police Department General Orders § 314.04(D). While we certainly do not suggest that the violation of police department policies is sufficient to make out a constitutional violation, we have found their existence and corresponding notice to officers relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 448–449 (5th Cir. 1998). In *Gutierrez*, we found a genuine dispute of material fact as to whether officers acted reasonably by "hog-tying" an arrestee who eventually died because evidence suggested that the San Antonio Police Department may have prohibited the practice or had notice of its potential dangers through a law enforcement study it possessed. *Id.* at 448–49. We described this factual dispute as "important because it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned." *Id.* at 449; *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (noting that the information an officer possesses when acting can affect the objective legal reasonableness of the officer's conduct in the Fourth Amendment search context); *Tennessee v. Garner*, 471 U.S. 1, 18–19 (1985) (looking to policies adopted by police departments to inform its analysis on the reasonableness of using deadly force to prevent the escape of unarmed suspected felons).

residence were repeatedly yelling that Darden could not breathe. If the plaintiff's version of events is true, Officer Romero's actions were plainly in conflict with our case law at the time of the alleged misconduct. *See Newman*, 703 F.3d 763–64; *Bush*, 513 F.3d at 501–02.

Furthermore, "'in an obvious case,' the *Graham* excessive-force factors themselves 'can clearly establish the answer, even without a body of relevant case law.'" *Newman*, 703 F.3d at 764 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). As is analyzed above, a jury could conclude that no reasonable officer would have perceived Darden as posing an immediate threat to the officers' safety or thought that he was resisting arrest. Therefore, viewing the facts in the light most favorable to Darden, Officer Romero's actions—choking, punching, and kicking Darden—were objectively unreasonable in light of clearly established law at the time of the incident. Accordingly, we hold that a reasonable jury could conclude that Officer Romero used excessive force. Officer Romero was not entitled to qualified immunity, and the district court erred in granting his motion for summary judgment.

## B.    The City of Fort Worth

In the proceedings below, the plaintiff also brought claims against the City, including a claim that the City had failed to properly train its officers. The district court did not reach the merits of the plaintiff's municipal liability claims. Because it held that the officers did not violate Darden's constitutional rights, the district court likewise held that the City could not be liable and granted the City's motion for summary judgment. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."). As discussed above, we hold that the plaintiff has adequately alleged facts that make out violations of a clearly

established constitutional right. Therefore, we vacate the district court's dismissal of the claims against the City and remand the case for further consideration of municipal liability. We express no opinion on the merits of that claim.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's dismissal of the claims against Snow and Romero, VACATE the dismissal of the claims against the City, and REMAND the case for further proceedings consistent with this opinion.