# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 24, 2020

No. 18-11624

Lyle W. Cayce
Clerk

ERIC C. DARDEN, as Administrator of the Estate of Jermaine Darden and
on behalf of the statutory beneficiaries of the Estate of Jermaine Darden
(which are Donneika Goodacre-Darden, surviving mother of Jermaine
Darden, Charles H. Darden, surviving father of Jermaine Darden,

> Plaintiff - Appellant

v.

CITY OF FORT WORTH, TEXAS,

> Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:15-CV-221

Before SOUTHWICK, GRAVES, and ENGELHARDT, Circuit Judges.

PER CURIAM:*

This case arises from the death of Jermaine Darden, who suffered a heart
attack and died while being arrested by police officers employed by the City of
Fort Worth. Mr. Darden's estate sued, alleging that the officers used excessive
force and that the City was liable for failing to adequately train the officers.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 18-11624

With respect to the failure-to-train claim, the district court granted summary judgment in the City's favor. We affirm.

## I. BACKGROUND

On May 16, 2013, a large team of heavily armed police officers executed a no-knock warrant on a private residence in Fort Worth, Texas. *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 725 (5th Cir. 2018). Officer W. F. Snow was assigned to the entry team, which was tasked with breaking down the front door, entering the residence, and securing the premises. *Id.* Officer Javier Romero drove the van that transported the team to the residence, but was also assigned to stand guard near the front door while other officers entered the residence and arrested the people inside. *Id.* Two other members of the team wore cameras on their helmets, which captured on video some, but not all, of the events that transpired as the warrant was executed. *Id.*

When the police first arrived at the house, the entry team broke down the front door with a battering ram, yelled that they were police, and ordered everyone to get down. *Id.* A man, later identified as Jermaine Darden ("Mr. Darden"), was kneeling on the seat of a couch near the door when the officers entered, and he immediately raised his hands in the air. *Id.* Mr. Darden weighed approximately 340 pounds. *Id.* As Officer Snow entered the residence, he reached out and ripped the shirt off Mr. Darden's back, apparently in an attempt to get Mr. Darden from the couch to the ground. *Id.* The videos do not show what happened during the twenty-five seconds that followed, and there is conflicting testimony about what transpired. *Id.* at 725–26. Officer Snow twice used a Taser on Mr. Darden, who at one point appeared to push himself up on his hands. *Id.* at 726. Other people in the house repeatedly yelled, "He's got asthma," and, "He can't breathe." Eyewitnesses also testified that Mr. Darden told the officers he could not breathe and that he pushed himself up on

his hands because he was trying to get into a position where he could breathe. *Id.*; *id.* at 726 n.3.

As Officer Romero finished placing handcuffs on Mr. Darden, Mr. Darden's body went limp. *Id.* at 726. The officers then pulled Mr. Darden's debilitated body up into a sitting position and left him there. *Id.* Mr. Darden appeared to be unconscious, and his head hung down on his chest. *Id.* It was subsequently determined that Mr. Darden had suffered a heart attack and died. *Id.*

The administrator of Mr. Darden's estate ("Plaintiff-Appellant") brought suit under Title 42 U.S.C. § 1983, claiming (1) that Officers Snow and Romero used excessive force in arresting Mr. Darden; (2) that the City of Fort Worth ("the City") was liable for failing to adequately train the officers; and (3) that various defendants were liable for state-law torts. *Id.* at 727. All of the defendants filed motions for summary judgment, and the district court granted those motions and dismissed the case. *Darden*, 880 F.3d at 727. The district court determined that the officers had not violated clearly established law and were thus entitled to qualified immunity. *Id.* Because it held that the officers had not violated Mr. Darden's constitutional rights, the district court also granted summary judgment in favor of the City on the municipal liability claims. *Id.*

The administrator of Mr. Darden's estate appealed to this court, which reversed the district court's dismissal of the claims against Officers Snow and Romero. *Id.* at 734. The panel also vacated the dismissal of the claims against the City, remanding the case for further proceedings. *Id.* On remand, the

No. 18-11624

district court again granted summary judgment in favor of the City on the estate's municipal liability claims.[1] This appeal followed.

## II. STANDARD OF REVIEW

"We review a summary judgment de novo, 'using the same standard as that employed by the district court under Rule 56.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

Only one question is before this court: did the district court err in granting the City summary judgment on Plaintiff-Appellant's municipal liability claim? We conclude that it did not.

A municipality may be liable under Title 42 U.S.C. § 1983 ("Section 1983") if the municipality itself "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monnell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 692 (1978)). But local governments are only responsible for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665–83). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy" for purposes of Section 1983. *Connick*, 563 U.S. at 61. However, "[a] municipality's

---

[1] The district court also found that the City was entitled to summary judgment on Plaintiff-Appellant's state law claims. Plaintiff-Appellant did not address those claims in his appellate briefing. They are therefore forfeited. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal."); *Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) (per curiam) ("Claims not pressed on appeal are deemed abandoned.")

culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). When such a claim is made, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

Here, Plaintiff-Appellant alleges that the City provided inadequate training regarding the proper use of no-knock warrants, Tasers, and excessive and deadly force. In order to succeed at this stage, the City must show that there is no genuine dispute as to a material fact regarding (1) whether there was an inadequacy in the City's training policy; (2) whether the City was deliberately indifferent in its adoption of that policy; or (3) whether the inadequate training policy directly caused the constitutional violation allegedly suffered by Mr. Darden. *See, e.g.*, *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).

Plaintiff-Appellant does not argue a pattern of similar constitutional violations. Instead, it relies on the single-incident exception to that rule. As such, the City must show that there is no genuine dispute as to whether the constitutional violation allegedly suffered by Mr. Darden was the "highly predictable" consequence of the City's failure to train the officers in its Zero-Tolerance Unit. *See Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010). It has met that burden.

The City proffered, and the district court relied on, several "General Orders" governing police practices that were in place on the day of Mr. Darden's death. Those orders largely restate applicable law regarding the use of force. While the existence of such policies is not dispositive, "[w]e consider

compliance with state requirements as a factor counseling against a 'failure to train' finding." *Zarnow*, 614 F.3d at 171.

Plaintiff-Appellant seeks to evade the import of the City's existing policies by emphasizing that its allegations are specific to the City's Zero-Tolerance Unit, which specializes in serving search warrants and conducting searches of residences, including "dynamic entries" and no-knock warrants. Plaintiff-Appellant offered evidence, in the form of an affidavit by Dallas Independent School District Police Chief Craig Miller,[2] that "[n]othing can potentially be more dangerous than making a Dynamic Entry into a location" about which officers have "very little information." The City, Plaintiff-Appellant emphasizes, offered no evidence that members of the Unit receive training on the use of excessive force and Tasers in the context of dynamic entries.

However, "a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Plaintiff-Appellant's general position is that the City failed to provide any training specific to the use of excessive force and Tasers in the context of no-knock entries. But it has not identified—in its briefing, at oral argument, or in post-argument supplemental briefing—how such training would differ from the existing training on using excessive force and Tasers.[3] Even Chief Miller, in his affidavit, neglected to address this issue. Indeed, he offered the conclusory statement that "a lack of adequate training [was] a

---

[2] Prior to being employed by the Dallas Independent School District, Mr. Miller served as the Deputy Chief of the Crimes Against Persons Division of the Dallas Police Department. Mr. Miller also served as the Homicide Unit Commander.

[3] Plaintiff-Appellant emphasizes that the City "was supposed to provide the members of this unit with a 'briefing sheet' in order to 'make sure that all of the pertinent information is communicated to everybody that's involved,'" but that no such information was provided. This argument is unhelpful to Plaintiff-Appellant, as it suggests that the City did have an official policy of providing briefing sheets before no-knock entries.

No. 18-11624

significant part of the reason [the officers] utilized more force than the situation required" and opined that (1) "there were alternatives to conducting a dynamic entry search warrant," (2) the Zero Tolerance Unit "made entry into a location without proper intelligence and ultimately caused the death of Jermaine Darden," and (3) "nothing can potentially be more dangerous than making a dynamic entry into a location where, according to the briefing sheet, they had very little information."

Given this gap in Plaintiff-Appellant's allegations and summary judgment evidence, we conclude that the City is entitled to summary judgment. It has shown that—in this case, given the evidence now before the court—there is no genuine dispute as to a material fact regarding whether there was an inadequacy in the City's training policy.[4]

## IV. CONCLUSION

The district court order granting summary judgment in favor of the City on Plaintiff-Appellant's municipal liability claims is AFFIRMED.

---

[4] The parties dispute whether Plaintiff-Appellant's failure-to-train claim includes not just a failure-to-train on the use of excessive force and Tasers, but also a failure-to train-on rendering medical aid. That claim was largely ignored by the district court, and it is unclear whether or not it was adequately pled. (The operative complaint alleges only that the City "failed to implement and/or enforce policies, practices, and procedures for the Fort Worth Police Department that respected Jermaine Darden's constitutional rights to assistance, protection, and equal treatment under the law"; that the City is responsible for "assuring safety for all citizens of the City of Fort Worth"; that Mr. Darden told Officers Snow and Romero that he could not breathe but that his pleas were ignored; that Mr. Darden "was not provided with medical attention and sat unresponsive for at least 15 minutes before Medstar arrived"; and that the City "failed to implement and/or enforce the policies, procedures, and practices necessary to provide constitutionally adequate protection and assistance to [Mr.] Darden during his struggle to survive and implemented policies, procedures and practices which actually interfered with or prevented [Mr.] Darden from receiving the protection, assistance, and care he deserved.") But resolving that question is unnecessary. At no point did Plaintiff-Appellant offer any evidence regarding how the City's training on rendering medical aid is defective. That claim, like the others, therefore fails.