# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 14, 2022

Lyle W. Cayce
Clerk

No. 20-50237

John Fairchild; Susie Fairchild,

*Plaintiffs—Appellants*,

*versus*

Coryell County, Texas; Steven Russell Lovelady;
Wesley Harland Pelfrey,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CV-29

Before Jolly, Southwick, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

What began with pretrial detainee Kelli Leanne Page's tapping her hairbrush on the cell door ended forty-five minutes later with two jailers' applying force to her lower back and neck until she died. Page's parents brought excessive force claims against the county and the two jailers. The district court held that no constitutional violation occurred and granted summary judgment to all defendants. But viewing the facts in favor of the plaintiffs would allow a jury to find that the jailers used excessive force. And

No. 20-50237

the jailers' continuing to apply that force for more than two minutes after Page was subdued would violate clearly established law. We thus reverse.

I

By October 2017, Page had spent several months in the Coryell County jail awaiting trial. She was a 46-year-old woman, who stood 5'6" and weighed 220 pounds. She had serious mental health challenges as well as physical ailments. On the morning of October 8, Page woke up around 7:30 a.m. What happened for the next hour is largely undisputed.

Around 7:50, Page began tapping her hairbrush on the cell door, and at one point she knocked her hip against the door. Steven Lovelady and Wesley Pelfrey—the two primary jailers on duty—did not want the noise to disrupt others on the hall. At 8:13, Pelfrey approached the door to Page's cell and talked to her for about ten minutes. During this discussion, Page allegedly told Pelfrey that she was going to "stab [him] in the eye with a hairbrush." After Pelfrey left, Page did nothing for a while and then, at 8:29, began tapping on the door again.

Lovelady decided to enter Page's cell to try and stop the tapping. He opened the food slot in the door and asked Page to turn around to be handcuffed. When she did not obey, Lovelady used pepper spray. The spray caused Page to retreat towards the far wall as Lovelady and Pelfrey entered the cell right at 8:30.

While Page remained at the back of her cell facing away from the jailers, Lovelady sprayed Page's face with pepper spray three more times. Page tried to shield her face with a sheet, all the while holding onto the hairbrush. Lovelady then stepped towards Page (preparing to handcuff her) as she remained standing with her back towards the officers.

No. 20-50237

What happened next—a span of a few minutes that ended in Page's death—is hotly disputed. The plaintiffs say Lovelady "slammed [Page] to the floor." Lovelady testified that he "attempted to turn her around and she suddenly let go of the sink," which "caused her to fall to the floor." Once Page ended up on the floor, a struggle ensued as the jailers tried to handcuff Page. The parties dispute numerous details about that struggle. Because our assessment of what a jury could conclude about these moments is a focus of the legal analysis that follows, we will not recite those facts here.

The struggle resulted in Page lying flat on her stomach with her hands handcuffed behind her back, and Lovelady, who weighed 230 pounds, sitting atop Page with his knee on her back. Pelfrey, who weighed 390 pounds, pressed his forearm against her neck. Page was held face down in this manner for over two minutes. The jailers rolled Page over to find her unresponsive. They attempted to administer CPR until relieved by the deputy sheriff. Soon after, Page was declared dead.

Page's parents filed this section 1983 suit against the county, Lovelady, and Pelfrey. At summary judgment, the district court held that the jailers' use of force was reasonable. That doomed all the claims, as a constitutional violation is a predicate for claims against both the individual defendants and county. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (noting that the first qualified immunity question is whether the public official violated the Constitution); *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (recognizing that municipal liability requires an underlying constitutional violation).

II

Force against a pretrial detainee is "excessive" and a violation of the Fourteenth Amendment when the force was objectively unreasonable.

No. 20-50237

*Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015).  The following factors bear on the reasonableness inquiry:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.  We must assess the reasonableness of the force from the perspective of a jailer who is often forced to make split-second decisions in tense situations.  *Id.* at 399.

The district court concluded that all of the factors except the extent of the injury favored the jailers.  It based this conclusion on the following view of the evidence:  The threat of Page's disturbance left the jailers with no choice but to enter the cell and restrain her.  She refused orders and resisted being handcuffed, and then she accidentally fell to the floor.  Once on the floor, she continued to engage in belligerent resistance: she kicked and bit the officers and took their handcuffs.  The officers could not regain control of the situation until they pinned her to the ground and handcuffed her.  They did not put any weight on her.  When they finally caught their breath, they noticed that Page was not moving and tried to resuscitate her.  On that rendition of facts, we would be inclined to agree with the district court that the force was reasonable.  *Cf. Narro v. Edwards*, 829 F. App'x 7 (5th Cir. 2020) (unpublished) (per curiam).

But the district court's view is not the only view a jury could take of the evidence.  Although reasonableness in excessive force cases is viewed from the officer's perspective, that does not mean we automatically accept his testimony about what happened.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  As is always true at summary judgment, the facts must be viewed in

favor of the nonmovant. *Id*; *see also* FED. R. CIV. P. 56. Construing the video[1] in favor of the plaintiffs shows that a jury could reach different conclusions on a number of facts that impact the reasonableness calculus.

First, there are important factual disputes about how Page ended up on the floor. One reasonable interpretation of the video is that Lovelady grabbed Page's wrist from behind, pulled her away from the wall, and pushed her onto the floor head-first. Yet the district court failed to acknowledge the possibility that Lovelady threw Page to the floor—in fact, it never described how Page landed on the floor.

Second, there are disputes a jury would need to resolve about the force used during the attempt to handcuff Page. After Page landed on the floor, the jailers tried to pin her down and handcuff her while Page moved about on the floor. The court found that Page bit and kicked and tried to "grab Lovelady's groin" while she struggled. A few kicks are visible on the video. And because Lovelady's body partially blocks the view of Page's actions during a key twenty-second window when the officers were trying to retrieve the handcuffs from her, the video does not contradict the testimony that Page bit and grabbed Lovelady. The video is, however, at odds with the district court's view of the force Lovelady used in response. The court mentioned that Lovelady struck Page twice in the abdomen with his knee but ignored three other instances of force by Lovelady that are visible on the video. He punched Page's face with a closed fist while trying to regain control of the handcuffs. After this first punch, the jailers reclaimed the handcuffs and attempted to roll Page onto her stomach. Ten seconds after the jailers retrieved the handcuffs, Lovelady punched Page in the face again. And,

---

[1] Prison surveillance cameras captured the incident. That footage is available at https://www.ca5.uscourts.gov/opinions/pub/20/20-50237.mp4.

twenty seconds after retrieving the handcuffs, while turning Page over, Lovelady punched Page in the face a third time.

Third, there are disputes about the force the jailers used during the final minutes of Page's life when Lovelady was pressing his knee on her lower back.[2] The district court concluded that the evidence indisputably showed that the jailer did not "put[] any of his weight on her" during this stage. But after Lovelady successfully handcuffed Page, the video shows that he continued to straddle her with his knee in her back. The video also shows Pelfrey forcing his elbow onto Page's neck. Even Pelfrey testified that the video "makes it look like he had [his] elbow on the back of" Page's neck, though he denied that is what actually happened. The district court took Pelfrey at his word, concluding that "Pelfrey never put his body on Page at all—much less in a manner that would impede her breathing." In ruling at summary judgment, we must take the opposite view—that Pelfrey was pushing his elbow in to Page's neck—because that is a reasonable conclusion from the video.

Construing all these disputed facts in favor of the plaintiffs results in the following version of events:

> Page caused a noise disturbance on the hallway, leading Lovelady and Pelfrey to intervene. After using pepper spray through the door, they entered her cell, pepper sprayed her in the face three more times, and threw her to the floor. Page grabbed Lovelady's handcuffs and lay face-down on top of the handcuffs. As Lovelady and Pelfrey tried to regain the

---

[2] Between the two jailers, Lovelady used more force than Pelfrey in the moments leading up to Page's death—using knee kicks, striking her face, straddling her, and applying pressure to her back. But Pelfrey was also actively involved in the incident, especially in the final minutes. As both Lovelady and Pelfrey used force, we disagree with plaintiffs' view that this presents a case of bystander liability.

No. 20-50237

handcuffs, Lovelady applied two "knee strikes" and punched Page in the face. Page resisted by kicking and once biting Lovelady but remained pinned to the floor. The jailers eventually pulled the handcuffs out from under Page's body. As they flipped Page onto her stomach, Lovelady punched her in the face two more times. When Page was lying prone on her stomach, the jailers handcuffed her hands behind her back, and continued to apply weight to her neck, back, and legs for more than two minutes until she became unresponsive.

This account substantially differs from one the district based its ruling on. And the differences between the two versions affect the excessive force analysis. We proceed to assess the reasonableness factors in light of the above version of the facts, which we must accept at summary judgment.

We first note the two factors that are not affected by our different assessment of how a reasonable jury could view the facts. The extent of Page's injury (death) is obviously severe and favors the plaintiffs.[3] On the other hand, the jailers did arguably temper or attempt to limit their force by first using verbal commands and then using pepper spray before entering the cell;[4] this factor thus favors the defendants.

---

[3] Plaintiffs argue that the testimony of Dr. Veasey at the inquest hearing is inadmissible hearsay and cannot be reproduced in admissible form because the doctor has since died. Dr. Veasey's testimony disputes the medical examiner's listing the cause of death as "mechanical asphyxia"; he attributes Page's death primarily to preexisting conditions. Although the district court quoted Veasey's testimony in reciting the facts, we do not read its analysis as rejecting the autopsy's conclusion that Page died of asphyxiation. In any event, we review summary judgment *de novo* and in doing so must resolve any genuine dispute over the cause of death in the plaintiffs' favor.

[4] Lovelady and Pelfrey stated in their affidavits that before they entered Page's cell, they attempted to calm her down verbally, asked her repeatedly to stop hitting the wall, and used pepper spray. Though they ultimately used significant force to restrain Page, they did try other methods before resorting to force. *See Yarrito v. Cook*, 1995 WL 17788756, *6 (5th Cir. June 22, 1995) (per curiam) (unpublished) (explaining that it counseled against a finding of excessive force that defendants did not apply force until trying and failing to

No. 20-50237

### A.     The severity of the security problem at issue and the level of threat reasonably perceived by the jailers

The factual disputes noted above affect whether Lovelady and Pelfrey unreasonably escalated force after the security risk subsided. *See Kitchen v. Dallas Cnty.*, 759 F.3d 468, 477–78 (5th Cir. 2014).[5]

The initial "threat" perceived by the officers was Page's tapping her hairbrush against the window and knocking her hips against the door of her cell. But by the time the jailers entered the cell Page was standing with her back towards the jailers, trying to shield her face from further pepper spray. The factual dispute about whether the jailers threw Page to the floor or she fell determines whether they responded reasonably to the low security threat the noise from Page's tapping her hairbrush posed at the outset of this incident. *See Rankin v. Klevenhagen*, 5 F.3d 103, 105, 108 (5th Cir. 1993) (finding a constitutional violation when guards "slammed" inmate to the floor, handcuffed him and "stomped" on him in response to inmate's shouting at female prisoners).

The defendants also claim that when Page took Lovelady's handcuffs, she created a renewed threat that justified more force. But that cannot explain the continued application of force for minutes after the jailers repossessed the handcuffs. Even after Lovelady had the handcuffs back, he punched Page in the face several more times, and the lethal use of force by

---

verbally convince the detainee to return the guards' handcuffs). As an unpublished decision issued before 1996, *Yarrito* is precedential. *See* 5TH CIR. R. 47.5.3.

[5] *See also Piazza v. Jefferson Cnty.*, 923 F.3d 947, 953–54 (11th Cir. 2019) (concluding that a detainee running down the hall away from officers did not pose enough of a security risk to justify multiple taser shocks); *Estate of Booker v. Gomez*, 745 F.3d 405, 412–13, 424–25 (10th Cir. 2014) (holding that even though a detainee attempted to strike a guard, putting substantial pressure on the detainee's back, tasing him, and applying a neck hold was disproportionate to the need after the detainee was brought to the floor).

No. 20-50237

Pelfrey (putting pressure on Page's neck) begins a full thirty seconds after Lovelady regained the handcuffs. *See Bourne v. Gunnels*, 921 F.3d 484, 492 (5th Cir. 2019) (concluding a fact issue existed on whether the force employed after restraining prisoner on the floor was necessary); *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 73 (1st Cir. 2016) (finding a material fact dispute on whether officers used excessive force when moving handcuffed detainee to holding cell). A jury could conclude that the force used by Lovelady and Pelfrey exceeded any reasonable response to the threat caused by Page's brief possession of the handcuffs and her bite and kicks.

The district court noted that the jailers may have believed Page to be a security threat because of an episode a day earlier when Page sprayed Lovelady with cleaning solution through the slot in her door while he collected the lunch trays. But like any threat posed by Page's noise disruption or her grabbing the handcuffs, the perceived threat caused by the events of the day before cannot justify force beyond the time when the threat subsided. *See Piazza*, 923 F.3d at 953; *Comeaux v. Sutton*, 496 F. App'x 368, 371, 374 (5th Cir. 2012) (per curiam) (unpublished). If the jailers were wary that Page might again attempt to spray them with cleaning solution, that possibility would have been ruled out by the time they approached her. *See Kitchen*, 759 F.3d at 478.

Consequently, a jury could conclude that any reasonable officer would see that Page represented a low threat at the moment when Lovelady threw her to the floor and applied continuous force. The incident began as a nonviolent noise disturbance and Page made no movement toward the jailers before Lovelady pinned her to the ground. By the time Pelfrey applied pressure to Page's neck a few minutes later, she was restrained in the prone position and represented almost no risk. *See Timpa v. Dillard*, 20 F.4th 1020, 1030 (5th Cir. 2021) (holding that this factor favored a finding of excessive force because a jury could conclude that officers no longer faced an

"immediate threat of harm" once the arrestee was "restrained, surrounded, and subdued").

### B.    *Whether the plaintiff was actively resisting*

Another factor is whether Page actively resisted the jailers. *Kingsley,* 576 U.S. at 397. The defendants rely heavily on Page's resistance—namely her tapping on the door after the jailers asked her to stop, her refusing to be handcuffed, and her struggling after the jailers had pinned her to the floor. To be sure, Page resisted once she was on the floor, including taking the handcuffs, kicking Lovelady a few times, and biting him once. But the jailers used force both before any of this active resistance began[6] and for minutes after it ceased. Because Page did not actively resist at these critical stages of the encounter, this factor does not favor the jailers as much as the district court believed. *See Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2021) ("Force must be reduced once a suspect has been subdued."); *id.* (explaining that "summary judgment is inappropriate when the timing of the officer's force may or may not have corresponded to the timing of the subject's resistance").

### C.    *The relationship between the need for the use of force and the amount of force used*

The remaining *Kingsley* factor captures the core of the excessive force inquiry: Was the amount of force proportional to the need for force? 576 U.S. at 397. Much of what we have already said in assessing other factors influences this one. Page had not engaged in any physical resistance before

---

[6] Until Lovelady grabbed Page's arm and threw her to the floor, the only acts of resistance were shaking her head "no" and turning her back. This passive resistance did not justify throwing Page to the floor. *Valencia v. Wiggins*, 981 F.2d 1440, 1443, 1447 (5th Cir. 1993) (holding that hitting detainee's head against the wall and applying chokehold was unreasonable response to detainee's passive refusal to leave his cell).

Lovelady took her to the floor.  So, it is hard to justify that use of force.  Once Page was on the floor with a jailer on top of her, she did grab the handcuffs and respond with kicks and a bite when Lovelady tried to retrieve them.  Some force was certainly warranted to retrieve the handcuffs.  But once that was accomplished and the jailers were flipping Page back over onto her stomach, Lovelady punched her in the face two more times.  Then even after Page was lying on her stomach handcuffed, the jailers continued to apply weight to Page's neck, back, and legs for more than two minutes despite facing no resistance or threat from her.  *See Tucker v. City of Shreveport*, 998 F.3d 165 181–82 (5th Cir. 2021) ("[A] use of force that may begin as reasonably necessary in order to obtain compliance may cease to be so as a suspect becomes more compliant."); *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009) (recognizing that "an exercise of force that is reasonable at one  moment can become unreasonable in the next if the justification for the use of force has ceased").

For these reasons, if a jury views the facts in the light most favorable to the plaintiffs, the jailers engaged in excessive force at various periods once they entered Page's cell.

## III

Our conclusion that, on one view of the evidence, the jailers violated the constitution requires reversing the grant of summary judgment to Coryell County.  The district court's only ground for dismissing the county was the lack of a constitutional violation.  A governmental entity like a county does not enjoy qualified immunity from section 1983 lawsuits; that defense is provided only to public employees. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980) ("[T]here is no tradition of immunity for municipal corporations.").   Other obstacles exist to holding a local government responsible for constitutional violations under section 1983, such as

identifying a policy or custom that motivated the unlawful conduct. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). But the district court did not consider that requirement because it had limited discovery to the issue of qualified immunity (which includes the underlying question of a constitutional violation). The claim against the county will thus be remanded.

## IV

The jailers, however, can assert qualified immunity. They are liable for unlawful conduct only if their actions violated "clearly established" constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As the Supreme Court recently reminded us, we cannot "define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). Precedent applying the rule must be specific enough that it is "clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). That specificity is "especially important" in excessive force cases. *Bond*, 142 S. Ct. at 11 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The caselaw specificity required to overcome qualified immunity is lacking for the early parts of the fateful encounter. It is a close call whether it is clearly established that throwing Page to the ground was an excessive response to her tapping the hairbrush on the cell door. But given that the jailers did first seek compliance through verbal commands, we do not see the notice of unlawfulness that qualified immunity requires. And as we have noted, when Page took the handcuffs, it was not excessive for the jailers to try and overcome her resistance and subdue her. The knee strikes and punches may have crossed the line of excessiveness but—given the need to subdue Page at this juncture—not clearly so. The jailers thus cannot be liable for the early stage of the incident.

But a jury's finding that the jailers continued to apply pressure to Page's neck, back, and legs for more than two minutes after she was subdued—Page at this point in the encounter was lying prone on her stomach with her hands handcuffed behind her back—would establish a violation of clearly established law. *Timpa,* 20 F.4th at 1028–29 (explaining that qualified immunity may provide a defense at the early stages of an encounter but not later stages when the continued use of force violates clearly established law); *Aguirre v. City of San Antonio*, 995 F.3d 395, 424 (5th Cir. 2021) (Jolly, J., concurring in the judgment) (concluding that the officers' use of force was initially justified but became a violation of clearly established law when officers continued to "apply the maximal restraint position for another two minutes" after the decedent had appeared to stop resisting). "Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable." *Timpa*, 20 F.4th at 1034. In cataloguing our jurisprudence on this point last year, *Timpa* identified features of the cases that had "reaffirmed" this principle "again and again." *Id*. at 1035–36 (discussing *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018);[7] *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016); *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008)). Most will sound familiar: the seized individual was "suspected of only a minor offense," "initially resisted," "was obese and forced to lie prone on [the] stomach with [] hands restrained and bodyweight force applied to [the]

---

[7] Defendants incorrectly argue that *Darden* is irrelevant to the "clearly established" inquiry because it issued in 2018, after the incident in this case. But *Darden* was evaluating whether excessive force occurring in 2013 was clearly established when it happened. *See* 880 F.3d at 725, 731–33. *Darden* is instructive about what was clearly established when Page died in 2017. Plus, part of *Darden*'s reasoning for finding a clearly established violation is that it presented an "obvious case." *Id*. at 733. That obviousness ruling is not tied to a certain timeframe. Moreover, *Timpa* evaluates "clearly established" law as of August 2016, a year before Page died. 20 F.4th at 1034.

back," and "[m]ost importantly . . . was subdued, unable to flee, and non-threatening during the continued use of force."  *Id.* at 1036 (citations omitted).  By the time of this October 2017 encounter, the law had thus "clearly established the unreasonableness of [Pelfrey's and Lovelady's] continued use of bodyweight force to hold [Page] in the prone restraint position after [she] was subdued and restrained."  *Id.*

\* \* \*

We REVERSE the grant of summary judgment and REMAND for further proceedings.