# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 18, 2023

Lyle W. Cayce
Clerk

No. 22-20341

Shamarian Austin, *Dependent Administrator of the Estate of Jamal Ali Shaw, Deceased*; Donna Thomas; Cliff Benjamin Mitchell,

*Plaintiffs—Appellants*,

*versus*

City of Pasadena, Texas; Martin E. Aguirre; Joanna S. Marroquin; Darlene McCain, also known as Rita M. McCain; Ryan W. Whitehead,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-774

Before Higginbotham, Southwick, and Willett, *Circuit Judges*.
Leslie H. Southwick, *Circuit Judge*:

Plaintiffs claim law enforcement officers violated the Constitution when they responded to a detainee's epileptic seizure in a jail cell by restraining and tasing him several times. The district court either dismissed or granted summary judgment on all claims in favor of the Defendants. We REVERSE the grant of qualified immunity for the individual Defendant-Officers as to the Section 1983 claims, and the grant of summary judgment

No. 22-20341

on the claims for bystander liability.  We AFFIRM the grant of summary judgment on municipal liability and on the claims under the Americans with Disabilities Act and Rehabilitation Act.

FACTUAL AND PROCEDURAL BACKGROUND

At 2:33 a.m. on March 28, 2019, Pasadena Police Department Officer L. Arguetta arrested 32-year-old Jamal Ali Shaw for suspicion of public intoxication.  Officer Arguetta booked Shaw into the Defendant City of Pasadena jail.  At 6:07 a.m., Pasadena Police Service Officer ("PSO")[1] Joanna Marroquin placed Shaw into detention Cell H without incident.  Cell H is a holding cell for detainees held on Class-C misdemeanors, typically traffic warrants, awaiting a court appearance.

A video recording[2] shows that, around 6:15 a.m., Shaw fell to the floor due to an epileptic seizure.  Other detainees in Cell H alerted staff that Shaw was having a seizure.  At around 6:16 a.m., Marroquin observed Cell H and made a call on the police radio requesting emergency medical services ("EMS").  PSO Ryan Whitehead and Marroquin then entered Cell H and removed all detainees other than Shaw.

At 6:17 a.m., Marroquin and Whitehead entered Cell H.  Shaw initially was lying on his side.  He was making up and down movements with his head, convulsing, and foaming at the mouth.  Shaw then rolled onto his back.  After standing over Shaw's convulsing body for about a minute, Marroquin and Whitehead placed their hands on Shaw's back and shoulder.  The district

---

[1] Although Defendant-Officers Whitehead, Marroquin, and McCain have the title "Police Service Officer" or "PSO," they are civilian employees and are neither licensed peace officers nor licensed jailers.

[2] Defendants' Exhibit 9 collects 15 videos.  Most of the relevant events inside Cell H, from 6:15:15 to 6:27:50, are captured in a single video.

court found that "[i]t is unclear from the Jail Video what they are trying to do," but that Defendants allege "they were trying to keep Shaw away from the wall," while Plaintiffs claim "they [were] trying to 'restrain him and turn him prone.'"

Shaw then began to roll, kick, and allegedly bite Marroquin and Whitehead. Between 6:18 and 6:21 a.m., Whitehead and Marroquin kept their hands on Shaw, at times seeming to move him away from the wall and at other times appearing to restrain his limbs, while Shaw continued to move and kick. The district court again found that "[a]t times it is unclear from the video what the PSOs are attempting to do."

At 6:21 a.m., Whitehead attempted to pin and straddle Shaw. When the PSOs could not gain control of Shaw, Marroquin removed her Taser from her holster. She then deployed her Taser in "drive-stun" mode, which is used to force compliance through the pain of the electrical shock, several times to Shaw's left side and leg between 6:21 to 6:22 a.m.[3] A fact question exists as to whether the Taser contacted Shaw each time, as he continued to move around and kick.

Shaw then rolled away from the PSOs, got up, and walked toward the toilet area of the cell. At 6:22:48 a.m., PSO Supervisor Darlene McCain entered the cell. Shaw then moved toward Whitehead, who deployed the Taser. The Taser contacted Shaw's chest, and he fell forward, face-first, onto the concrete floor. McCain and Marroquin backed up while Shaw thrashed on the floor and Whitehead continued to tase Shaw.

At 6:23 a.m., McCain grabbed Shaw's right hand and dragged him to the center of the cell. At that time, Whitehead tased Shaw again in the chest

---

[3] Record evidence shows Marroquin and Whitehead had not received up-to-date Taser training.

for several seconds as Shaw kicked. All three PSOs attempted to restrain Shaw. Also at about 6:23 a.m., the ambulance arrived.

At 6:24:40 a.m., Pasadena Police Officer Martin Aguirre entered Cell H. Aguirre joined the PSOs in restraining Shaw, and Aguirre pressed his knee into Shaw's back. At 6:26:10 a.m., two Emergency Medical Technicians ("EMTs") arrived at Cell H with a gurney, but they were denied entry and waited outside the cell. At 6:26:30 a.m., Aguirre completed handcuffing Shaw behind his back. The officers held Shaw down while Marroquin left the cell to retrieve a restraint chair at 6:27:27 a.m. A few seconds later, Whitehead and Aguirre grabbed Shaw's shoulders and stood him up to walk him to the door, and Shaw fell. At this time, an EMT asked the officers if they wanted to place Shaw on the stretcher, but the officers declined.

Approximately two minutes passed from when the EMTs first asked to help until they were allowed to do so. At 6:28 a.m., the officers strapped Shaw into the restraint chair and rolled him to the booking area for evaluation by the EMTs. The EMTs then administered Shaw two injections to calm his behavior at 6:36 a.m. and 6:44 a.m. Shaw remained in the restraint chair for approximately 17 minutes, until 6:47 a.m. While in the restraint chair, Shaw yelled, called for his mother, and cried "Help me," but he could not respond to questions. Shaw eventually was moved to a gurney, and Aguirre handcuffed Shaw again.

Shaw was placed in the ambulance. As it began to leave the jail at 6:57 a.m., Shaw suffered cardiac arrest. He died the next day due to cardiopulmonary arrest.

In March 2021, Plaintiffs filed suit under 42 U.S.C. § 1983 against PSOs Marroquin, Whitehead, and McCain; Officer Aguirre; and the City of Pasadena. Plaintiffs filed their first amended complaint in May 2021. The district court granted Aguirre's Rule 12(b)(6) motion to dismiss Plaintiffs'

Section 1983 claims against him based on qualified immunity. The district court denied Aguirre's motion to dismiss Plaintiffs' claims based on bystander liability and denied the City's motion to dismiss in full.

After discovery, all Defendants moved for summary judgment on all remaining claims. On June 6, 2022, the district court granted the Defendants' motion for summary judgment in full. The district court entered final judgment on June 6, 2022. Plaintiffs timely appealed.

## DISCUSSION

We review a grant of summary judgment *de novo*, applying the same standard as a district court. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Factual disputes are material if they "might affect the outcome of the suit under the governing law," and they are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where an individual defendant asserts qualified immunity, plaintiffs "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Vann v. City of Southaven*, 884 F.3d 307, 309 (5th Cir. 2018) (quotation marks and citations omitted).

We also review *de novo* a district court's order granting a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Converse v. City of Kemah*, 961 F.3d 771, 774 (5th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The complaint "must be supported by factual allegations," *id.* at 679, which must "raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quotation marks and citation omitted).

On appeal, Plaintiffs challenge both the district court's order granting summary judgment and the district court's order granting dismissal of their claims against Aguirre based on his own conduct.  Plaintiffs contend the district court erred in the following ways: (1) in granting summary judgment for the individual officers (Marroquin, Whitehead, and McCain) based on qualified immunity as to the Section 1983 claims for excessive force and improper/delayed medical treatment; (2) in dismissing under Rule 12(b)(6) the Section 1983 claims against Aguirre based on qualified immunity; (3) in granting summary judgment on the bystander claims; (4) in granting summary judgment on municipality liability against the City; and (5) in granting summary judgment on the claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").

We address the arguments in that order.

### I.    *Defendant-Officers' qualified immunity as to claims for excessive force and for improper/delayed medical treatment*

We begin with the claims against individual Defendant-Officers Marroquin, Whitehead, and McCain for excessive force and improper/delayed medical treatment.  "Qualified immunity protects officers from suit unless their conduct violates a clearly established right." *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003).  The test for qualified immunity involves two steps: "first we ask whether the officer's alleged conduct has violated a federal right; . . . second we ask whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on

notice of the unlawfulness of his or her conduct." *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (quoting *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019) (en banc)).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation marks and citation omitted). "[C]ases involving fundamentally similar facts" are not always necessary to provide the "fair warning" that officers require. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotation marks omitted). Furthermore, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.*

### a.    *Excessive force*

The district court granted qualified immunity for the individual Defendant-Officers as to the excessive force claim because Plaintiffs failed to "identify . . . case law on point" that established it is unconstitutional repeatedly to tase someone experiencing a medical seizure. Defendants maintain that the caselaw at the time of Shaw's incarceration does not clearly establish the officers' actions were unlawful. They allege no opinion was discovered "where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *See White v. Pauly*, 580 U.S. 73, 79 (2017). Plaintiffs insist it is well established in precedents that using force on a subject who is not resisting is unconstitutional.

Because we may begin our analysis under either qualified immunity factor, we start with the merits of the excessive force claim. *See Timpa v. Dillard*, 20 F.4th 1020, 1029 (5th Cir. 2021).

### i.     *Factor 1: violation of a federal right*

"A pretrial detainee receives the protection of the Due Process Clause of the Fourteenth Amendment." *Brothers v. Klevenhagen*, 28 F.3d 452, 455–56 (5th Cir. 1994). Force against a pretrial detainee is "excessive" and a violation of the Fourteenth Amendment when the force was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). Courts weigh the following factors to determine reasonableness:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.[4]

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "If an

---

[4] The Supreme Court explained that the factors governing the "objective reasonableness" of an officer's force for Fourteenth Amendment purposes are the same factors that apply in the Fourth Amendment context. *See id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Supreme Court established the standard governing excessive force under the Fourth Amendment in *Graham*, 490 U.S. at 396–97. Consistent with that precedent, this court has treated the standards for Fourth and Fourteenth Amendment excessive force claims as interchangeable. *See, e.g.*, *Timpa*, 20 F.4th at 1029 (quoting *Kingsley* in analysis of Fourth Amendment excessive-force claim); *Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) (en banc) (same).

officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). This court has made clear that force which is disproportionate to the need is unreasonable. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 324 (5th Cir. 2020).

Turning to this case, Plaintiffs maintain that the Defendant-Officers' actions constituted excessive force under the *Kingsley* factors. Defendants respond that the officers' use of force was justified and reasonable because Shaw was actively resisting restraint by kicking at and attempting to bite them. They assert the officers "used only that force necessary to secure Shaw to prevent Shaw from injuring himself, the Appellees and paramedics, and to get Shaw medical aid." Thus, Defendants argue, there is no issue of material fact as to whether the officers used excessive force.

Defendants contend the present situation is analogous to *Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000). That case involved the arrest of a suspect who initiated a violent physical altercation with the officers, "swinging his fists[] [and] striking" them. *Id.* at 318. The officers placed the suspect in the prone position with bodyweight force on his back while they applied handcuffs. *Id.* at 319. Once restrained, the officers placed the suspect on his stomach in the prone position in their patrol car to be transported to jail, where they discovered he was not breathing, and he later died. *Id.* This court held the officers' use of force was reasonable because the suspect had violently continued to resist arrest during the officers' use of force and "there were no apparent physical signs that [the suspect] was substantially at risk" of asphyxiation. *Id.* at 324.

Defendants contend that, similarly, here, the Defendant-Officers used a Taser to respond to a detainee who was actively resisting restraint and on whom openhand restraint efforts had failed. They allege that some of the

physical struggle with Shaw was due to the officers' efforts to place Shaw on his side so his breathing would not be inhibited by his body position while the officers awaited EMS.  Thus, Defendants argue, this court's precedent at the time of Shaw's arrest authorized the Defendant-Officers' actions.

Plaintiffs counter that we should distinguish the present situation from *Wagner*, just as we did in *Timpa v. Dillard*.  *See* 20 F.4th at 1037–38.  In *Timpa*, we reversed a grant of qualified immunity to officers who held a man experiencing a mental health episode, known as "excited delirium," in a prone position for nearly 15 minutes, leading to his death.  *Id.* at 1025–26.  *Timpa* involved officers responding to a medical emergency, which this court emphasized only "sharpen[ed] the excessiveness" of the use of force in light of precedents involving arrestees "suspected of serious crimes."  *Id.* at 1036.  The officer claimed his use of force was reasonable because the subject continued to struggle against him.  *See id.* at 1030–31.  The court rejected that argument based on record evidence showing that "an objectively reasonable officer with [the defendant's] training would have concluded" that someone experiencing excited delirium was prone to asphyxiation and would be "struggling to breathe, not resisting arrest."  *Id.* at 1031.

The *Timpa* court found the following factors distinguishing: "*Wagner* did not speak to the use of force at issue here — a prone restraint with body-weight force while Timpa was *restrained and subdued*."  *Id.* at 1038 (emphasis added).  Additionally, Timpa never engaged in a violent altercation, officers continued kneeling on Timpa and holding him prone after he was subdued, and Timpa had characteristics that placed him at risk for asphyxiation.  *See id.* at 1037–38.

It is undisputed that, just as in *Timpa*, the officers in this case were responding only to the medical emergency Shaw was experiencing, not to any

purported disturbance or danger to others.  The officers stated in police records that they were aware Shaw was experiencing a seizure as reported.

Additionally, record evidence supports that Shaw was not *actively* resisting and that the officers were aware of this.  Whitehead testified during his deposition that he understood that a person suffering from a seizure typically remains confused and disoriented afterwards.  Similarly, Marroquin testified during her deposition that she understands that "a person having a seizure [would have] involuntary movements," that "they [would do] things that they weren't intentionally doing," and that such a person was "not in control."  In fact, the district court acknowledged Shaw was "experiencing a seizure and subsequently [was] in a disoriented postictal state, perhaps lashing-out out of fear, anxiety, confusion, and agitation."  Indeed, Marroquin stated in her deposition that Shaw was "still incoherent" when being treated in the booking area.  This is further confirmed by the records of EMS personnel who recorded Shaw's mental status as "Not Normal," and described Shaw as frightened, crying for help, and unable to respond to questions.  The district court properly found that genuine factual disputes remain as to "when exactly Shaw's seizure end[ed] and when his postictal state [began], whether Shaw [was] in fact experiencing a series of seizures, and the extent of his consciousness" throughout the incident.  A jury could therefore infer the officers knew when shocking and restraining Shaw that he was incapable of understanding commands or rationally responding to "pain compliance."

Moreover, Plaintiffs also presented evidence that the officers knew Shaw to be generally "kind and respectful" and not aggressive when sober.  According to the autopsy, Shaw was sober during the events at issue here.  This demonstrates that, just as in *Timpa*, a jury could find that reasonable officers in Defendants' position would not have believed Shaw needed to be restrained as if he were actively resisting.

Plaintiffs also contend the *Kingsley* factors weigh in their favor here, just as they did in *Fairchild v. Coryell County*, 40 F.4th 359 (5th Cir. 2022). *Fairchild* concerned an excessive-force claim brought by the parents of a pretrial detainee who died after "jailers continued to apply pressure to [the detainee's] neck, back, and legs for more than two minutes" after she had stopped resisting. *Id.* at 368. It was undisputed that the detainee actively resisted the jailers at the beginning of the encounter, including grabbing their handcuffs and "kick[ing] and bit[ing]" one of the jailers. *Id.* at 363. Relying on *Timpa*, among other cases, the court held that the "continued use of bodyweight force to hold [the detainee] in the prone restraint position after [she] was subdued" was unreasonable. *Id.* at 368 (quoting *Timpa*, 20 F.4th at 1036) (second alteration in original).

The *Fairchild* court found the detainee's "nonviolent noise disturbance" — "tapping her hairbrush against the window and knocking her hips against the door of her cell" — to be a "low security threat." *Id.* at 365–66. Similarly, here, the security threat here was low or nonexistent. Shaw fell ill and threatened no one; other detainees were promptly transferred to another cell; and Shaw remained confined.

Additionally, in both cases, fact issues exist as to whether the jailers responded to the situations reasonably pursuant to their training. *See id.* Marroquin testified during her deposition that she learned, through her job as a PSO, that in responding to a seizure, officers should "place the person on their side, place something under their head so they don't hurt themselves, and obviously [] call ambulance right away." She also testified that she was trained to avoid causing someone to suffer positional asphyxiation, which is "[p]lacing someone in a compromising position that can stop them from breathing." As such, she was trained not to place detainees face-down on their chests. Also, according to Plaintiffs' corrections expert, law

enforcement officers typically are taught to avoid shooting Tasers at the chest because of the significantly increased risk of causing a heart attack.

Based on this record, nothing prevented the officers from deescalating, leaving the cell, and waiting for EMS to arrive. Plaintiffs' corrections expert stated no reasonable jailer would enter the cell to initiate force against Shaw before the arrival of EMS; jailers should know not to restrain persons suffering an epileptic seizure; and jailers should recognize that any flailing of the victim's limbs is not directed toward the jailers but is a result of the seizure. A jury could find that a reasonable officer in the Defendant-Officers' position would have done little more than cushion Shaw's head as they were trained to do.

Furthermore, the video evidence both in *Fairchild* and here does not conclusively refute the plaintiffs' reasonable views of the evidence that the detainees only passively (or involuntarily, in Shaw's case) resisted before the officers initiated and escalated force. *See id.* at 363–64, 366 n.6. The videos in both cases also do not conclusively refute the plaintiffs' views that the officers continued to unnecessarily apply force after the detainees were subdued. *See id.* In both cases, a jury could conclude that the force employed was disproportionate to the need[5] and that "the jailers engaged in excessive force at various periods once they entered [the detainee's] cell." *See id.* at 367. Plaintiffs assert that if "the individual cannot understand why he is being shocked, is unable to control his body, and cannot understand and

---

[5] Defendants contend that force was necessary to "help" Shaw. As this court discussed in an unpublished case, "where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure. Rather, using force likely to harm the subject is manifestly *contrary* to the government's interest in initiating that seizure." *Pena v. City of Rio Grande City*, 816 F. App'x 966, 972 n.9 (5th Cir. 2020) (quotation marks and citation omitted) (emphasis in original).

respond to commands even if they were given, repeatedly inflicting pain results in nothing but torture" and "does so at the extreme risk of causing asphyxiation and a heart attack."

Moreover, "we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). Here, only three minutes elapsed between when two of the officers initially "place[d] their hands on" Shaw and when they first attempted to tase him — a rapid escalation, given that the only justification for using force at all was to help Shaw, who had just experienced (or was still experiencing) a seizure.

Therefore, viewing the record in the light favorable to Plaintiffs, a jury could find that a reasonable officer would have concluded that Shaw was continuing to experience a seizure or was in a postictal state, not actively resisting the officers, and that the physical restraint used here — particularly tasing Shaw multiple times — constituted excessive force in violation of his Fourteenth Amendment rights.[6] "Ultimately, it is the job of the factfinder, not of this court, to resolve those factual disputes for itself. A jury's interpretation ensures that legal judgments of reasonableness hew closely to widely shared expectations of the use of force by our police officers." *Timpa*, 20 F.4th at 1032.

### ii.    *Factor 2: clearly established law*

To repeat, the district court determined Plaintiffs had not identified on-point authority establishing that repeatedly tasing someone who is

---

[6] Although a court must consider the separate acts of each defendant, it need not perform a separate analysis for each. *Meadours v. Ermel*, 483 F.3d 417, 422 n.3 (5th Cir. 2007). Defendants assert, "the district court here properly conducted its evaluation of the four Officer Defendants together because the analysis as to each individual officer is not materially different in light of video evidence." We agree.

experiencing a seizure is unconstitutional. Qualified immunity is appropriate "unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quotation marks and citation omitted). Even so, it is not necessary that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope*, 536 U.S. at 740 (quotations marks and citation omitted).

"In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful." *Darden v. City of Ft. Worth*, 880 F.3d 722, 727 (5th Cir. 2018). We recently held that in this circuit, "the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable." *Timpa,* 20 F.4th at 1034 (collecting cases). For instance, in *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), this court held that an officer who slammed an arrestee's face into a car after she was "handcuffed and subdued," *id.* at 501, was not entitled to qualified immunity. Notably, in that case the officer claimed the arrestee "continued resisting arrest while he attempted to cuff her." *Id.* at 496. We determined, though, the duration of the arrestee's resistance was a disputed fact which precluded qualified immunity at the summary judgment stage. *Id.* at 502. This court has clarified that "'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody — for example, by being pinned to the ground by multiple police officers — force is not justified." *Joseph*, 981 F.3d at 335.

Furthermore, in *Darden v. City of Fort Worth*, we held that "a constitutional violation occurs when an officer tases, strikes, or violently slams" a subject who "is not actively resisting." 880 F.3d at 731. In that case, we reversed the grant of qualified immunity to officers who physically restrained

and repeatedly tased a man they suspected of dealing cocaine. *Id.* at 725–26. While the officers claimed the arrestee was not complying with their commands and struggled against their restraint, the court determined a factual dispute remained as to whether the arrestee, who was asthmatic and told the officers he could not breathe, was "merely trying to get into a position where he could breathe and was not resisting arrest." *Id.* at 730.

In addition to *Darden*, we have reversed the grant of qualified immunity to officers in several other cases involving excessive force with Tasers. *See, e.g.*, *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (tasing a restrained, subdued subject in prone position); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) (tasing a subdued subject); *Anderson v. McCaleb,* 480 F. App'x 768, 773 (5th Cir. 2012) (tasing a subject who was no longer resisting); *Massey v. Wharton,* 477 F. App'x 256, 263 (5th Cir. 2012) (tasing a subject who was not resisting, was not a threat to the officers or others, and was not attempting to flee); *Autin v. City of Baytown,* 174 F. App'x 183, 186 (5th Cir. 2005) (tasing a subdued subject who was not resisting).

These cases clearly established the alleged unreasonableness of the Defendant-Officers' continued tasing and use of force to restrain Shaw after he was subdued and restrained and when he was not actively resisting due to a medical emergency. Genuine fact disputes exist as to whether the Defendant-Officers restrained and subdued Shaw before they continued to tase him, hold him in prone position on his chest with an officer's knee pressed to his back, and handcuff him in a restraint chair. Similarly, factual disputes remain regarding whether Shaw was actively resisting restraint or was merely passively/involuntarily resisting due to the effects of his seizure.

This conclusion comports with a recent decision of another circuit that has considered similar facts. *See Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021). There, police officers repeatedly tased a young woman

while she was experiencing a seizure. *Id.* at 1269. "Tasing an individual once (let alone three times) when the individual poses no threat to the officers or others and is experiencing a medical emergency" is so "patently excessive that the constitutional violation was clearly established," "even in the absence of case law." *Id.* at 1276 (quotation marks and citation omitted).

Because at the time of this incident it was clearly established that the continued use of force, particularly tasing, against a restrained and subdued subject who was not actively resisting due to a medical emergency violates the Fourteenth Amendment, the Defendant-Officers are not entitled to qualified immunity, as fact issues remain.

### b.    *Deprivation of essential medical care*

The district court also granted the Defendant-Officers qualified immunity as to the claim for deprivation of essential medical care, finding that Plaintiffs did not show the officers violated Shaw's right to medical care. The Due Process Clause of the Fourteenth Amendment guarantees pretrial detainees the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001). "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001). To succeed on a deliberate-indifference claim, plaintiffs must show (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Id.* at 755 (quotation marks and citation omitted).

Deliberate indifference may be established through inferences arising from circumstantial evidence, and a factfinder may infer the requisite knowledge from the fact that the risk of harm was "obvious." *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Dyer v. Houston*, 964 F.3d 374, 385 (5th

Cir. 2020) (reasonable juror could conclude officer was deliberately indifferent where unjustifiably high risk to detainee's health was obvious). An officer acts with deliberate indifference to a detainee's serious medical needs if the officer "refuse[s] to treat him, ignore[s] his complaints, intentionally treat[s] him incorrectly, or engage[s] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022) (quotation marks and citation omitted). A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care or intentionally treats the detainee incorrectly. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

A delay in medical care violates the Constitution "if there has been deliberate indifference [that] *results in substantial harm*." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (quotation marks and citation omitted) (emphasis and alternation in original). "[P]romptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency . . . constitutes unconstitutional conduct." *Cope v. Cogdill*, 3 F.4th 198, 209 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022). The detainee need not die, or be permanently impaired, before an actionable claim arises for delayed emergency treatment; rather, a plaintiff may recover for pain suffered during a delay in treatment caused by deliberate indifference. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422–23 (5th Cir. 2017).[7]

---

[7] Plaintiffs also cite Eleventh Circuit caselaw that further fleshes out the standard for deliberate indifference in this context. The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994). Evaluating a delay in providing medical attention for life-threatening injuries such as asphyxiation "is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *See Valderrama v. Rousseau*, 780 F.3d 1108, 1120 (11th Cir. 2015) (quotation marks and citation omitted). "[W]hen officers intentionally delay seeking treatment for a life-threatening injury, they act with deliberate indifference." *Id.* at 1121. A jury can infer deliberate

No. 22-20341

In this case, it is undisputed that Marroquin called for EMS immediately upon realizing Shaw was experiencing a seizure. The district court concluded Plaintiffs did not show deliberate indifference because the officers' "response of immediately calling an ambulance and attempting to restrain Shaw before putting him in the gurney was appropriate in light of his continued resistance and Defendants' concern for the safety of Shaw, themselves, and the EMTs." Defendants assert the district court properly granted summary judgment on this claim, as the Defendant-Officers promptly and adequately provided Shaw access to essential medical care consistent with this court's holding in *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).

In response, Plaintiffs maintain the Defendant-Officers acted with deliberate indifference in improperly treating Shaw. The Defendant-Officers were trained to do the following in response to a detainee's seizure: "place the person on their side, place something under their head so they don't hurt themselves, and obviously [] call ambulance right away." Additionally, in order to avoid someone suffering positional asphyxiation, they were trained to "[o]bviously not have [a detainee] on their chest." As Plaintiffs' corrections expert stated, law enforcement officers typically are taught to avoid shooting Tasers at the chest because of the significantly increased risk of causing a heart attack.

The officers also understood that a person suffering from a seizure typically remains confused and disoriented afterwards and experiences involuntary movements. The Defendant-Officers, however, seemingly responded counter to the training and arguably exacerbated Shaw's condition. They did

---

indifference when an officer fails to justify or explain a delay in medical treatment. *Wade v. Daniels*, 36 F.4th 1318, 1327–28 (11th Cir. 2022).

not cushion Shaw's head but, instead, applied force while he likely was in a confused state and unable to understand what the officers expected of him. They dragged Shaw across the concrete floor; tased him in the chest, causing him to fall to the floor and hit his head; held him in prone position on his chest; and again repeatedly tased him.

Viewing the evidence in the light most favorable to Plaintiffs, we find that this is "obviously" wrong treatment for a seizure and that the officers either "intentionally treat[ed] him incorrectly, or engage[d] in [] similar conduct that [] clearly evince[d] a wanton disregard for any serious medical needs." *See Sims*, 35 F.4th at 951 (quotation marks and citation omitted). Accordingly, a jury could find that each Defendant-Officer knew they were intentionally treating Shaw incorrectly for a seizure, thereby violating his constitutional right to protection. *See Estelle*, 429 U.S. at 104–05; *Domino*, 239 F.3d at 755–56; *Dyer*, 964 F.3d at 382.

Further, Plaintiffs insist the Defendant-Officers acted with deliberate indifference in delaying Shaw's access to emergency care. Plaintiffs' medical expert concluded the cumulative effect of the officers' sustained force severely restricted Shaw's breathing and ultimately led to his fatal heart attack from mechanical and electrical asphyxiation. Plaintiffs assert Shaw was in need of immediate emergency treatment and transfer to a hospital after experiencing a seizure, being tased up to 10 times, falling and hitting his head on the concrete floor, and being restrained for several minutes.

When EMTs arrived at Shaw's cell, the officers denied the EMTs entry. The EMTs waited outside of the cell for about two minutes until the officers brought Shaw out, at which time an EMT "asked if they wanted them to put Shaw on the stretcher." The officers declined to do so and instead confined Shaw to a restraint chair with his arms handcuffed behind his back for at least 17 minutes. According to Plaintiffs' medical expert, this

double restraint significantly compounded the effects of physical and electrical asphyxiation Shaw had already suffered. Utilizing the restraint chair also seemingly delayed his transport to a hospital. Shaw flatlined in the ambulance before it left the jail.

Viewing the evidence in the light most favorable to Plaintiffs, we find that a jury could decide it should have been obvious to each Defendant-Officer that Shaw was in need of immediate emergency treatment; that a different medical emergency existed than when EMS was called for the seizure; and that Shaw's breathing and heart had been compromised from being held in stress positions and tased. A jury could determine that, by improperly delaying emergency medical treatment, the Defendant-Officers increased Shaw's pain and likelihood of death and were therefore deliberately indifferent to his serious medical needs. *See Easter*, 467 F.3d at 464; *Alderson*, 848 F.3d at 422–23. A genuine dispute of material fact exists as to whether the officers intentionally treated Shaw incorrectly in responding to his seizure and whether the officers' actions constituted a harmful delay in Shaw's accessing emergency medical care.

Accordingly, we reverse the district court's grant of qualified immunity for the individual Defendant-Officers as to the claims of excessive force and improper/delayed medical treatment.

## II.    *Section 1983 claims against Aguirre for his own conduct*

The district court dismissed under Rule 12(b)(6) Plaintiffs' Section 1983 claims against officer Aguirre for excessive force and delay/denial of medical care, reasoning he was entitled to qualified immunity. The district court determined that Plaintiffs "produce[d] no controlling authority supporting the contention Aguirre's conduct violated Shaw's clearly established constitutional rights."

At the time Aguirre entered Cell H, Shaw had been restrained, dragged across the concrete floor, tased up to 10 times, and pinned to the floor by three officers. Plaintiffs contend this force was neither necessary nor reasonable, and certainly no further force was necessary at the time Aguirre entered the cell. "If the suspect lacks any means of evading custody — for example, by being pinned to the ground by multiple police officers — force is not justified." *Joseph*, 981 F.3d at 335. Yet, when Aguirre entered the cell, he immediately assisted the officers in restraining Shaw in a prone position on his chest, with Aguirre's knee pressed to Shaw's back for several minutes. Aguirre then assisted the officers in moving Shaw to the restraint chair — instead of the gurney as recommended by EMS — and handcuffing Shaw's arms behind his back for at least 17 minutes.

As discussed above in Section I, Aguirre's actions arguably delayed Shaw's access to critical medical care. Furthermore, a reasonable inference could be made that, when Aguirre approached the cell, he knew Shaw was suffering from an epileptic seizure and was not attempting to attack or threaten anyone. Multiple officers were familiar with Shaw, and Shaw's family had taken seizure medication to the jail for him more than once. Also, the other detainees in the cell immediately recognized Shaw was experiencing a seizure. Hence, one could infer that Aguirre acted unreasonably in applying force to, and doubly restraining, Shaw — a known seizure victim — when Shaw was already restrained or subdued, presented no threat to himself or others, and was not actively resisting restraint.

For the reasons explained above in Section I, we find that Plaintiffs have identified clearly established law that Aguirre's actions constituted excessive force and delay/denial of emergency medical care. Accordingly, we reverse the district court's dismissal of the Section 1983 claims against Aguirre.

### III.    *Claims for bystander liability*

Defendants assert that because Shaw's rights were not violated, the district court properly granted summary judgment on Plaintiffs' bystander claims.  "An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act."  *Joseph*, 981 F.3d at 343.  We have held that officers have a reasonable opportunity to intervene if they are present at the scene and that they violate their duty to intervene if their conduct demonstrates they acquiesced to the unconstitutional conduct engaged in by others.  *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  *Hale* is clearly established law that provides fair notice to officers of their duty to intervene, rather than to acquiesce, in the unconstitutional conduct of others.  *See Timpa*, 20 F.4th at 1039 (applying *Hale* to bystander claims).

As discussed in the previous sections, a reasonable jury could find that the individual Defendant-Officers violated Shaw's constitutional rights.  Similarly, Plaintiffs plausibly pled that Aguirre violated Shaw's constitutional rights.

Evidence at the summary judgment stage could support a jury finding that each of the individual Defendant-Officers acquiesced in the constitutional violations, both by not objecting and by participating in similar conduct.  Marroquin, Whitehead, and McCain were all present during the encounter, and each participated in the use of force and in responding to Shaw's medical emergency.  Marroquin and Whitehead each deployed the Taser on Shaw several times, and McCain helped restrain Shaw in prone position during the Taser shocks.  A reasonable jury could find that the three officers had sufficient time and opportunity to intervene and stop one another (1) from

tasing, doubly restraining, and using force on Shaw when he was subdued, restrained, and not actively resisting; and (2) from delaying/denying Shaw essential medical treatment.

As to Aguirre, upon entering Cell H, he immediately began assisting the officers in restraining Shaw in a prone position, which continued for several minutes. Plaintiffs argue Aguirre instead should have voiced dissent to the officers' use of force, alerted a law enforcement supervisor of the officers' use of force, or physically pulled the officers away from Shaw since Aguirre was a licensed peace officer. We agree that even if Aguirre did not know Shaw had suffered a seizure, a jury could determine Aguirre should not have immediately participated in using force without first determining the facts from supervisor McCain. A jury could also find that Aguirre acquiesced in the officers' delay of medical attention by assisting Whitehead in strapping Shaw into the restraint chair and handcuffing Shaw's arms behind his back. A jury could determine that, instead, Aguirre should have assisted EMTs in transferring Shaw to the ambulance gurney as EMTs requested.

Accordingly, because there are factual disputes as to whether each individual defendant witnessed fellow officers violate Shaw's constitutional rights and failed to act despite a reasonable opportunity, the district court erred in granting summary judgment on the bystander claims. *See Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013). This conclusion is consistent with the Eleventh Circuit's reasoning in *Helm v. Rainbow City*, in which the court determined that the officers holding down the seizure victim during the Taser shocks could be subject to bystander liability for their failure to intervene in the tasing officer's use of excessive force. 989 F.3d at 1277–78.

### IV. *Municipal liability against the City of Pasadena*

The district court granted summary judgment to the City, concluding there was no evidence that the City's use-of-force policy constituted the

moving force behind any alleged constitutional violation. Local governments are liable for a policy or custom that causes a constitutional injury under Section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To succeed on a *Monell* claim, plaintiffs "must show (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (quotation marks and citation omitted).

The parties dispute each *Monell* element. Defendants urge affirming the district court based on any of the elements, while Plaintiffs request the *Monell* claim be remanded for reconsideration since the district court concluded the individual defendants committed no constitutional violations.

The first element, the existence of a policy or custom, is satisfied if a practice is "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Allegations of an isolated incident are not sufficient to show the existence of a custom or policy." *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). What must be shown is "that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004) (emphasis in original).

We have recognized that a municipality may be liable for failing to adopt policies. *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "While the municipal policy-maker's failure to adopt a precaution can be the basis for § 1983 liability, such omission must amount to an intentional choice, not merely an unintentionally negligent oversight." *Id.* "[M]unicipal failure to adopt a policy does not constitute such an intentional choice unless it can be said to have

No. 22-20341

been deliberately indifferent." *Id.* (quotation marks and citation omitted). "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Id.*

The Pasadena Police Department's use-of-force policy declares:

It is the policy of the Pasadena Police Department that officers use only the force that is reasonably necessary to bring an incident under control, while protecting the life of the officer and others. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances.

The use-of-force policy contains a duty to intervene:

a) Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intervene to prevent use of such force.

b) Officers shall promptly report these observations to a supervisor.

The policy also provides a reporting requirement when force is used so that supervisory review can occur.

Additionally, all Pasadena police officers and PSOs who carry an Electronic Control Weapon ("ECW") receive training prior to being issued an ECW. The ECW policy states that an ECW "is considered a compliance/control weapon and consequently an intermediate level of force." Under that policy, "ECWs will be issued, handled, and deployed only by officers who have successfully completed the department's ECW Training Program and only in accordance with department policy and state law." The Department's policies provide:

The use of an ECW on certain individuals should generally be avoided unless the totality of the circumstances indicates that other available force options reasonably appear ineffective or would present a greater danger to the officer, the subject or others, and the officer reasonably believes the need to control the individual outweighs the risk of using the device.

In addition to these policies, Texas criminal law prohibits officers from using unnecessary or excessive force. *See* TEX. PENAL CODE §§ 9.51–9.54. Pasadena police officers and PSOs are trained and supervised to assure officers are appropriately guided to follow the law, City policy, and police department regulations. All individual Defendant-Officers received training via an academy and field training officer program. The City has no policy that directs, or authorizes, officers to violate federal law or constitutional protections. The City demands through its policies — including the police Oath of Office and police department regulations — that the City's officers comply with the requirements of the Constitutions and laws of both the United States and Texas.

Plaintiffs assert the City's formal use-of-force and ECW policies are "so vague and general that they amounted to no policy at all that meaningfully restrained an individual officer's use of force." Rather, allegedly, the City's "actual policy, custom, or practice was to tolerate and encourage excessive force." Such customs and practices are said to include "the failure to adopt any policy limiting the use of force against detainees suffering from an epileptic seizure; the failure to utilize pepper spray as a lesser means of force than Tasers; the failure to forbid shooting a Taser into a detainee's chest; and using unlicensed PSOs as jailers." Plaintiffs rely on the fact that multiple jailers — including a supervisor, as well as a police officer — all acted similarly, and none objected to the unconstitutional actions of the others, to demonstrate the existence of a widespread custom that shows this

"was accepted as the way things are done and have been done" in the City of Pasadena. *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985).

Defendants respond that the City's use-of-force and ECW policies are typical and in line with Texas law. We find that the record is insufficient to support a jury question that the use-of-force and ECW policies were so vague that they amounted to no policy at all. These policies "may have been inadequate," and while a jury might conclude that the City was negligent in not requiring Plaintiffs' specified actions, "that, of course, is not enough under § 1983." *See Rhyne*, 973 F.2d at 393. "Without evidence showing that the higher level of care was obviously necessary, we cannot see how the jury could conclude" that the use-of-force and ECW policies were deliberately indifferent. *Id.* "[T]here was no substantial evidence that such a policy would obviously lead to the violation of pre-trial detainees' constitutional right[s]." *Id.* at 394.

We affirm the district court's grant of summary judgment as to municipal liability against the City.

## V.    *Claims under the ADA and RA*

The district court concluded Plaintiffs did not show the officers' treatment of Shaw amounted to intentional discrimination against him by reason of his epilepsy. Rather, the evidence demonstrated the officers' "handling of Shaw's epileptic seizure and subsequent postictal state arose from their desire to establish physical control over Shaw in order to achieve a safe environment for emergency medical personnel to provide necessary care."

To survive a motion for summary judgment on a claim under the ADA, a plaintiff must show evidence that (1) he was a qualified individual under the ADA; (2) he was denied benefits by the City or otherwise being discriminated against by the City; and (3) such denial of benefits or discrimination is by reason of his disability. *Windham v. Harris Cnty.*, 875 F.3d 229,

235 (5th Cir. 2017).  Discrimination, if any, must be intentional rather than deliberately indifferent for a plaintiff to recover compensatory damages. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002).  "The prima facie case of discrimination under the [RA] is operationally identical to the test under the ADA."  *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004).

Plaintiffs cite to no binding caselaw in which liability under the ADA and RA has been extended to a context similar to this one.  Because they do not make a compelling case for doing so here, we consequently affirm the district court's grant of summary judgment.

REVERSED in part, AFFIRMED in part, and REMANDED.